2015 VT 93

## Arapaho Owners Association, Inc. and Mark Kattalia v. Linna Alpert, et al.

[128 A.3d 397]

No. 14-120

Present: Skoglund and Robinson, JJ., and Pearson and Tomasi, Supr. JJ., and Morris, Supr. J. (Ret.), Specially Assigned

Opinion Filed July 10, 2015

554

*Paul S. Gillies* of *Tarrant, Gillies, Merriman & Richardson,* Montpelier, for Plaintiffs-Appellants.

*Jon S. Readnour* of *Readnour Associates, P.C.,* Rutland, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Initially, this case appeared to require reconciliation of language in a condominium declaration, the Vermont Condominium Ownership Act (VCOA), and the Vermont Common Interest Ownership Act (VCIOA). After untangling the facts and the statutes, however, we resolve the matter in a more straightforward manner. We affirm.

¶ 2. The case began its journey through the legal system when the Board of Directors of the Arapaho Owners Association (BOD), appellant here, petitioned for a declaratory judgment seeking to reform the condominium's declaration to reflect the actual number of condominium units built and to allocate ownership interests among the units. The following facts are necessary to an understanding of the issues presented.

¶ 3. The Arapaho Village Condominium (Arapaho Village) in Ludlow, Vermont, was created in 1979, pursuant to the VCOA. 27 V.S.A. §§ 1301-1365. According to the Declaration of Condominium (Declaration), when initially conceived, Arapaho Village was to consist of fifty units. However, fifty-four units were actually built: five of the planned units each were subdivided into two "split" units, and one planned townhouse unit, 23F, was never built. Unfortunately, the master schedule of units known as Schedule D, a provision of the Declaration, was never amended to reflect the number of units built.

¶ 4. Sometime around 2008, issues were raised to the BOD concerning a disparity in assessments of common expenses, the claim being that owners of similar units were not paying the appropriate share of the same. In addition, there existed potential questions concerning marketability of title due to the subdivision of certain units and the inclusion in the Declaration of the planned unit that was never built. The BOD created a committee of owners to look at the issues and propose solutions. The committee recommended that the BOD put two amendments to the Declaration before the unit owners. The first proposed to amend the

Declaration to reflect the number of units that were actually built and to recalculate each unit's ownership share. The second amendment proposed to change the formula for allocation of common expenses. The voting results brought further controversy.

¶ 5. The first amendment, which would recalculate ownership share, required 100% approval by a vote of the unit owners, which it failed to achieve. The question of whether the amendment to the common-expenses allocation was adopted was muddled by the inconsistency created by the existence of the fifty-four units. Relying on Article 15 of the Declaration, which provides that any provision in the Declaration may be amended by a 75% vote of all unit owners, the BOD believed only a 75% affirmative ownership-interest vote was required for the adoption of a new allocation formula. According to the BOD, the amendment received votes representing over 75% of the total ownership interest of units actually constructed, but less than 75% of the scheduled ownership interests, due to the absence of anyone voting the allocated interest of unbuilt Unit 23F. Notwithstanding the uncertainty of the voting results, the BOD declared the vote legally sufficient and prepared a document captioned "Amendment to Declaration of Unit Ownership of Arapaho Village Condominium Reallocating Annual Common Expenses" (2010 Schedule D) and filed it in the Ludlow land records.

¶ 6. Attorneys were summoned. Apparently, the BOD was informed by its counsel that the 2010 Schedule D was not legal, as it violated §§ 1306(b) and 1310 of the VCOA. Further, the failure of the first amendment left the title problem unresolved.

¶ 7. The BOD, on behalf of the Association, brought an action in the superior court seeking to reform the Declaration to reflect the units actually built and to restate each unit's ownership share in the common areas according to the new formula that allegedly was adopted in the second amendment. The BOD in its complaint also sought a declaratory judgment to clear title to the existing units. Several owners of the split units, appellees here, opposed the request for reformation, and also filed a counterclaim seeking a declaration that the second amendment failed because it, like the first amendment, required unanimous approval under VCOA § 1306(b). Appellees in their counterclaim also sought an injunction and money damages, claiming their assessments had been illegally increased by the new formula. The BOD filed a motion for partial summary judgment on the reformation issue, and appellees filed a

cross-motion for summary judgment seeking a ruling as a matter of law that the second amendment did not pass.

¶ 8. In its decision, the trial court noted that all parties agreed the percentage of undivided interest for a unit owner had a permanent nature that could not be altered without the consent of all of the unit owners. Thus, there was no dispute the amendment to change the ownership shares failed because it did not receive unanimous consent as required by § 1306(b) of the VCOA.[1] In considering the effectiveness of the second amendment, which attempted to create a new formula for assessments of common expenses, the court recognized that the analysis required "unraveling the tangled interplay between the Arapaho Village declaration and two separate condominium acts: the VCOA, and the newer [Vermont] Common Interest Ownership Act [VCIOA], 27A V.S.A. §§ 1-101 et seq., which became effective in 1999."[2]

¶ 9. The court first considered Article 7 of the Declaration, which, as noted above, provided that common expenses would be allocated according to the same value-based formula that determines the ownership interest of each unit in the common areas. The court also looked at Article 15 of the Declaration, which provides that any provision in the Declaration may be amended by a 75% vote of all unit owners. While appellees argued that Arapaho Village could not amend the formula used to allocate common expenses except by the unanimous-consent requirement set forth in the VCOA § 1306(b), the court disagreed. The court opined that § 1306(b) applied only to an amendment that would alter each unit's declared ownership share of the common areas, and not to an amendment such as one that changed the allocation formula .formerly prescribed by § 1310. Finding no procedural requirement stated in § 1310,[3] the court reasoned that Arapaho Village could amend its Declaration to adopt a new allocation

---

[1] Section 1306(a) assigns to each unit an undivided interest in the common areas and facilities based on a percentage that shall be computed by taking as a basis "the value of the apartment or site in relation to the value of the property." Subsection (b) provides that the percentage of the undivided interest "shall have a permanent character" that cannot be altered without the unanimous consent of all unit owners. So, the ownership-reallocation amendment failed.

[2] The VCIOA is Vermont's adopted version of the Uniform Common Interest Ownership Act.

[3] Section 1310 of the VCOA provides that every condominium association must allocate its common expenses according to each unit's percentage ownership share in the common areas and facilities.

formula for common expenses so long as the amendment is approved by more than 75% of the unit owners.

¶ 10. Then the court folded in consideration of the VCIOA, which became effective in 1999. The VCIOA made a major adjustment to association management by permitting associations to choose different formulas for allocating common expenses and not limiting them to the traditional "value" calculation. Comments, 27A V.S.A. § 2-107. The court found that, under the VCIOA, Arapaho could amend its declaration to state a new formula for the allocation of common expenses, even though that was not possible under the VCOA § 1310. *Id.* § 1-206(a).[4] With this understanding, the court denied appellees' motion for partial summary judgment.

¶ 11. The court also denied the BOD's motion for partial summary judgment, which sought reformation of the Declaration to reflect the actual number of units that were built and to restate each unit owner's ownership share of common expenses according to the amended formula as proposed. The court held that reformation would only be appropriate if there was evidence to determine the original intent of the parties. The court suggested that, if reformation was appropriate at all, the percentage interest in the common areas had to be calculated according to "some formula that was agreed upon by the parties prior to the mistake — most likely the 'value' formula."

¶ 12. Appellees filed a motion for reconsideration, in which they argued, for the first time, that the VCIOA does not permit amendments to the allocation of common expenses by anything less than unanimous consent. The court denied the motion.

¶ 13. The BOD next sought summary judgment on the question of whether the second proposed amendment (regarding allocation of common expenses) received the number of votes necessary for approval. Appellees, in their response, argued again that the VCIOA § 2-117(d) requires unanimous consent for amendments to the allocation of common expenses. They filed their own motion for partial summary judgment. With a different judge presiding, the court then concluded that the original summary judgment

---

[4] Section 1-206(a) states, "The declaration, bylaws, or plat and plans of any common interest community created before the effective date of this title may be amended to achieve any result permitted by this title, regardless of what applicable law provided before this title was enacted."

ruling was flawed. It held that VCIOA required that *any* amendment to the Declaration to use a formula other than the value formula for allocating common expenses be unanimous under § 2-117(d). And, so, the court concluded that the second amendment (to change the formula for allocating common expenses) did not receive the necessary number of votes for approval.

¶ 14. Further, the court agreed with the first summary judgment decision that the equitable powers of the court to reform an erroneous condominium declaration could be used only to give effect to the original bargain that was struck between the developer and the unit owners. Thus, the second amendment could not be ratified by resort to equitable principles. The court granted appellees' motion for summary judgment, holding that the second amendment did not receive the number of votes necessary for approval and that the certification of amendment was void.

¶ 15. Next, the BOD filed a motion for further proceedings, primarily asking the court to choose a formula for assessment of common expenses, decide a claim for attorney's fees, and to "true-up" the assessments to correct for overpayments and underpayments that resulted from implementation of the 2010 amendment of Schedule D, which was voided by the court's decision. Both parties desired an equitable reformation of the Declaration that would eliminate unbuilt Unit 23F and recognize the five split units, and thus resolve the question of marketability of the Arapaho Village condominium units. Appellees filed a motion in support of their position, proposing a new Schedule D based on the formulas of the 1979 Schedule D, which, they argued, is "the clearest expression of the intent of the developer and the purchasing unit owner as to the percentage of undivided interest assigned to their unit."

¶ 16. The court reformed the Declaration as to the reallocation of the ownership percentage assigned to unbuilt Unit 23F, as proposed by appellees' Schedule D. The percentage assigned to Unit 23F was reassigned in proportion to the ownership interests of all the built units. The court understood BOD's proposed reallocation to assign the percentage of the phantom unit to the spilt units only, and held that "such an allocation is not consistent with the original intent of the developer and unit owners." It ordered a true-up of assessments in light of its reallocation of the unbuilt unit's ownership percentage.

¶ 17. More motion practice followed, seeking to resolve the issue of the split units. The BOD argued that the Schedule D approved by the court used the percentage the developer assigned to the whole unit before it was split into upper and lower units and used the square footage of the upper and lower units to arrive at the new number, ignoring the percentages the developer originally assigned to the six listed half units that were built. Apparently, the owners of the split units had been using this formula for many years to determine their share of ownership interests and expenses. As the 1979 Schedule D had never been amended to account for the split units, the percentage of ownership interest had been assigned to the former whole unit without regard to its division into two parts. The court found that using the percentage assigned to the whole unit most accurately met the original intention of the declaration.

¶ 18. The court granted appellees' motion for attorney's fees and costs, finding such award discretionary, 27A V.S.A. § 4-117(a), and awarding $40,000 to be recovered from the Association. This appeal followed.

¶ 19. The questions on appeal before this Court are: (1) whether a unanimous decision of unit owners is required to amend the formula for assessing common expenses; (2) what equitable powers of reformation are available to cure a defect in a condominium declaration; and (3) what amount of attorney's fees, if any, is appropriate.

¶ 20. ■■ The answer to the first question posed is found in 27 V.S.A. § 1306(b), which was the law in effect when Arapaho Village was created. Read in conjunction with § 1310, we hold that the common expenses are indeed assessed as part of the permanent property interest assigned in § 1306(b). While the court below relied on 27A V.S.A. § 2-117(d) to reach the same conclusion, § 2-117 is not one of the sections of the VCIOA automatically applicable to common interest communities created before January 1, 1999. See 27A V.S.A. § 1-204(a)(1).

¶ 21. If it applied to this case, however, § 2-117(d) would lend support to our interpretation of the earlier Act. It states:

> Except to the extent expressly permitted or required by other provisions of this title, no amendment may create or increase special declarant rights, increase the number of units, change the boundaries of any unit, or change

the allocated interests of a unit, or the uses to which any unit is restricted, in the absence of unanimous consent of the unit owners.

*Id.* § 2-117(d). The definition of "allocated interests" is found in 27A V.S.A. § 1-103(2): " 'Allocated interests' mean the following interests allocated to each unit: (A) In a condominium, the undivided interest in the common elements, the common expense liability, and votes in the association." The definition of "common expense liability" is found in § 1-103(6) and "means the liability for common expenses allocated to each unit pursuant to section 2-107 of the title." Therefore, under § 2-117(d), a unanimous decision of the unit owners is required to change the formula for assessing common expenses.

¶ 22. ■ The second question focuses on the availability of the doctrine of reformation to correct mutual mistakes such as those presented here. The purpose of reformation is to "correct mutual mistakes of the parties that have created a result neither party intended." *Cassani v. Northfield Sav. Bank*, 2005 VT 127, ¶ 15, 179 Vt. 204, 893 A.2d 325 (quoting *Burlington Sav. Bank v. Rafoul*, 124 Vt. 427, 431, 209 A.2d 738, 741 (1965)). In *Cassani*, the Court acknowledged its powers to act in equity to correct the parties' agreement (in that case a deed) where (a) the parties to the agreement agree that it fails to convey according to their intent; or (b) the agreement plus extrinsic evidence shows what was intended by the parties. *Id.* ¶¶ 14-16. The *Cassani* Court held that reformation was appropriate to bring the deed into conformance with the parties' antecedent agreement — to correct a mutual mistake of the parties. *Id.* ¶ 19.

¶ 23. ■ In *Strathmore Farms Ass'n v. Perrelli*, No. CV030484356S, 2004 WL 2595353 (Conn. Super. Ct. Oct. 12, 2004), the Connecticut Superior Court concluded that use of the court's equitable power to reform an erroneous condominium declaration is appropriate if it is able to find that the result of the reformation would be to give effect to the original bargain that was struck between the developer and the unit owners. *Id.* at *4. Here, the original 1979 Declaration set forth an allocation of ownership percentages for all the units that were to be constructed, including six half units that were part of the planned development and properly listed in the ⋅ Declaration, adding up to 100%. As previously noted, the 1979 Schedule D identifies only fifty units at Arapaho Village Condominiums, while fifty-four separate units

exist. The 1979 Schedule D accurately reflects the percentage of undivided interest for all of the constructed units but for the fact that Unit 23F was never built and five of the units (Units 17C, 23B, 23C, 24B, and 24C, the 'split units') listed on the original Schedule D were subsequently split into two units — an upper and a lower.

¶ 24. ■ In this case, both parties . sought reformation of the Declaration. Without a resolution from the court, genuine questions of marketability of title could not be answered. Both sides had interests, both legal and equitable, by reason of a significant uncertainty of rights, that required settlement between them. Hence, the submission to the court of a request for declaratory judgment was an appropriate use of that remedy. The purpose of a declaratory judgment action is to secure an adjudication of the rights of the parties, "so far as is requested and appropriate." *Shaw v. Barrows*, 134 Vt. 343, 343, 359 A.2d 651, 651 (1976) (per curiam). That is to say, a declaratory judgment " 'enunciate[s] so far as is requested and appropriate the rights of the parties and nothing more.' " *Cassani*, 2005 VT 127, ¶ 13 (quoting *Griffith v. Nielsen*, 141 Vt. 423, 427, 449 A.2d 965, 967 (1982)).

¶ 25. ■ In this case, the equitable powers of the court allowed it to reform the Declaration to achieve the intent of the declarant, which is to allocate ownership percentages for all the units adding up to 100% by correcting the mistake as to the number of units in existence and making changes to the percentage of undivided interest held by each unit. The original unit owners purchased their units and took title to their units with reference to the 1979 Schedule D and the percentage of undivided interest assigned to their units therein. Thus, the trial court was within its discretion in concluding that the 1979 Schedule D is the clearest expression of the intent of the original developer and the purchasing unit owners as to the percentage of undivided interest assigned to their unit.

¶ 26. The court acted within its equitable authority in resolving the title problem caused by the mutual mistake by reassigning the percentage of interest assigned to the unbuilt unit to the built units identified in the original 1979 Declaration in proportion to their ownership interests. This resulted in a modest increase in each remaining unit owner's undivided ownership percentage. This

approach to reformation used the ownership interest the developer assigned to the whole unit, before it was split into upper and lower units, as the basis for the reassignment of Unit 23F's interests, and thus, reformed the ownership interests in the condominium in a manner that most closely follows the majority of the ownership interests set forth in the 1979 Schedule D. This reformation was within the trial court's equitable discretion, which allowed it to resolve by declaratory judgment the mistakes in the Declaration.

¶ 27. For a number of years, owners of the units that were split without amendment to the Declaration apparently have been allocating the percentage of undivided interest for their whole units between the upper and lower units based on the square footage of each. The VCOA does not address this method, but a section of the VCIOA that does not automatically apply to pre-existing common interest communities like Arapaho Village none-theless provides some support as to the propriety of such a method. Section 2-113 of Title 27A deals with subdivision of units and subsequent reassignment of allocated interests. It states in part:

> [T]he owner of the unit to be subdivided [shall execute an amendment that] assign[s] an identifying number to each unit created[ ] and reallocate[s] the allocated interests formerly allocated to the subdivided unit to the new units in any reasonable manner prescribed by the owner of the subdivided unit or on any other basis the declaration requires.

27A V.S.A. § 2-113(b).

¶ 28. Under the BOD's proposed amendment of Schedule D, no component of common expenses allocated to the unit owner was to be based on the unit owner's percentage of undivided interest. Rather, the BOD created an entirely new method of assessing expenses.[5] Its opposition to the court's Revised Schedule D, as stated in its brief, is that the ten split units that were not recognized in the 1979 Schedule D now have percentage owner-

---

[5] The BOD's proposed amendment would allocate total annual common expenses between the units by applying a formula whereby 62.5% of the annual common expenses would be shared equally (i.e. per capita) and the remaining 37.5% would be allocated between the units based upon their finished areas as established by the Ludlow Board of Listers.

ships and expenses lower than the half units originally listed in the 1979 Schedule D. This results in the unplanned half units enjoying lower costs than the originally planned and constructed half units.

¶ 29. The fact that the newly created ownership interest resulting from the distribution of Unit 23F's interest might not match the percentages the developer assigned to the six half units from the original plans does not make the reassignment inequitable or improper. The court's reformation did not change the percentages reflected in the 1979 Schedule D that the original developer had allocated to the existing units.[6]

¶ 30. With the reformation/revision of ownership interests, the original value-based formula found in the Declaration for establishing the assessment of expenses remains viable. The original Declaration applied the requirements of 27 V.S.A. § 1310: "[C]ommon expenses shall be charged to[ ] the apartment or site owners according to the percentage of the undivided interest in the common areas and facilities." Article 7 of the Declaration provides that the unit owner's percentage of undivided interest establishes "the extent of the obligation of each unit owner for common expenses." Therefore, each unit owner's share of common expenses is now to be calculated by using the percentage of undivided interest set forth in the Revised Schedule D.

¶ 31. We affirm the court's reformation as to the number of units in the Arapaho Village Condominium project and the court's revision of Schedule D, which reassigns the unit owner's percentage of undivided interest in the community.

¶ 32. The third issue presented concerns the court's award of attorney's fees to appellees. The court relied on 27A V.S.A. § 4-117(a),[7] which allows for an award of attorney's fees in the discretion of the court when a unit owner has brought an action to enforce a right or obligation imposed by the VCIOA, the condominium declaration, or the bylaws. The BOD argues that

---

[6] By affirming the trial court's exercise of discretion in this case, we do not suggest that on this record the trial court's reformation of the condominium is the only possible reformation that would hew to the original intentions embodied in 1979 Schedule D, or that a reformation that treated all split units alike and maintained a uniform proportion between the allocations to split units and those to whole units would exceed the court's discretion.

[7] Pursuant to 27A V.S.A. § 1-204, § 4-117 applies automatically to a common-interest community created in this state before January 1, 1999.

§ 4-117(a) was amended, effective January 1, 2012, after the filing of this civil action, and that the former version of the statute should apply to this case. The former version read:

> If a declarant or other person subject to this title fails to comply with any provision of this title or any provision of the declaration and bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney's fees.

2009, No. 155 (Adj. Sess.), § 47. The BOD argues that the focus of the former version is on failure to comply with the title, declaration or bylaws, while in the amended version the focus is on enforcing rights or obligations imposed by any of the three listed authorities.

¶ 33. The BOD posits that no failure to comply was raised in this civil action. It argues further that regardless of which version of § 4-117(a) applies, it acted reasonably in appointing a committee to make recommendations and propose amendments to the Declaration, seeking a vote of the unit owners, obtaining legal advice when there was uncertainty as to the result of the vote on the proposed new formula for allocating common expenses, and ultimately bringing a declaratory action. The BOD also contends that even if the current version of the law applies, the award is inappropriate as appellees were not the substantially prevailing party.

¶ 34. ■ ■ Where a statute provides for or allows the court to award attorney's fees, the American rule, which otherwise places the responsibility on each party to pay its own attorney's fees, does not apply. See *Grice v. Vt. Elec. Power Co.*, 2008 VT 64, ¶ 29, 184 Vt. 132, 956 A.2d 561. And, where, as here, an award of attorney's fees is not mandatory, we review the award solely to determine whether the trial court abused its discretion. *Montgomery v. 232511 Invs., Ltd.*, 2012 VT 31, ¶ 15, 191 Vt. 624, 49 A.3d 143 (mem.) (citing *Burlington Free Press v. Univ. of Vt.*, 172 Vt. 303, 306-07, 779 A.2d 60, 64 (2001)). We hold that the court properly exercised its discretion in making an award of attorney's fees to appellees.

¶ 35. The court found the BOD acted appropriately in bringing the declaratory action to resolve the issues presented. The court

further held: "Despite repeated assaults upon the motivation of the BOD by the Owners, the Court does not find support for any nefarious intent by the BOD to specifically benefit the large unit owners at the expense of the small unit owners."

¶ 36. As no showing of bad faith or deliberate misconduct on the part of the BOD is required, the court analyzed the claim for attorney's fees under the two standards suggested in *Montgomery*. 2012 VT 31, ¶¶ 9-10. First the court looked at whether the counterclaim by appellees was a catalyst for the relief granted — a standard that requires the movants, appellees, to show that their suit was causally related to the BOD's actions and that their claims had a colorable or reasonable likelihood of success on the merits. *Id.* ¶ 9. The second standard evaluates whether the result was accomplished with sufficient judicial imprimatur to make the movant the prevailing party. *Id.* ¶ 10. The court found appellees were entitled to attorney's fees under either standard.[8]

¶ 37. We agree. Both the earlier version of 27A V.S.A. § 4-117(a) and the current iteration allow for an award when an action is brought to enforce compliance with the law, the declaration, or the bylaws. The difference in language in the two versions is of no moment. Appellees' pursuit of relief resulted in a judicial determination contrary to the resolution sought by the BOD. Appellees prevailed on their claim rejecting the hybrid formula for common-expense assessment and in obtaining a "true-up" of assessments consistent with the reformation they proffered. Appellees cross-appeal, however, seeking their requested fees and costs of $99,643.49 and arguing the court erred in awarding only $40,000 in fees and costs. They note that the BOD did not challenge their calculation of fees and costs; rather, it took the position that legal fees were simply not allowed under § 4-117(a). As found above, an award of legal fees was proper.

¶ 38. For determining "an award of attorney's fees under Vermont law, the touchstone is reasonableness." *Perez v. Travelers Ins.*, 2006 VT 123, ¶ 13, 181 Vt. 45, 915 A.2d 750. Here, the court started with the "lodestar figure" — "determining the number of hours reasonably expended on the case multiplied by a reasonable hourly rate" — and then adjusted that fee downward based on

---

[8] There was no challenge to the affidavit of attorney's fees presented by appellees and no objection to the reasonableness or amount of the fees sought or to the manner of proof of the fees as submitted.

various factors, such as "the novelty of the legal issue, the experience of the attorney, and the results obtained." *L'Esperance v. Benware*, 2003 VT 43, ¶ 22, 175 Vt. 292, 830 A.2d 675.

¶ 39. ■ The court limited its award to $40,000 based on several factors. First, it found that the overlap of two sets of statutes, the VCOA and the VCIOA, made the issues "somewhat novel." It also found that significant time was spent "on issues which were collateral to the seminal issues, such as whether a 75% vote had been achieved." The court stressed the fact that the BOD

> promptly sought judicial resolution of the issues facing the Association through a declaratory action once their attempts to do so through votes of the homeowners did not provide clarity. This is not a case where an association board took no action to address concerns and owners were forced to bring a claim to get relief.

¶ 40. While appellees suggest that the court's analysis of *L'Esperance* was flawed and that its reduction of attorney's fees from $99,643.49 to $40,000 was unsupported by facts, neither is true. It is true that the court was critical of appellees for not arguing with clarity the effect of VCIOA § 2-117(d) until they filed their motion for reconsideration of the first summary judgment decision: "The briefing on the 100% affirmative requirement was scarce at first and comparatively late in coming." But, as noted above, the court emphasized that the BOD took appropriate action to address the problems created by the unbuilt unit when it sought a declaratory action to reform the Declaration, clear title to the existing units, and change the formula for allocating common expenses.

¶ 41. ■ "Trial courts have ample discretion in determining the amount of attorney's fees to award . . . ." *Bonanno v. Verizon Bus. Network Sys.*, 2014 VT 24, ¶ 23, 196 Vt. 62, 93 A.3d 146. That discretion, however, must be based on an accurate assessment of the merits and efforts expended. Review of the entirety of circumstances attendant to this case leads us to uphold the award. The extensive litigation, the positions taken by both sides, the oddity of the situation faced by the BOD created years earlier by a phantom unbuilt unit, and the struggles of both sides and the

court below to resolve this situation support the court's discretion in awarding the attorney's fees and costs as it did. We affirm.[9]

*Affirmed.*

---

[9] We remand appellees' Motion to Enforce True-Up Order to the trial court to address in the first instance. The true-up of assessments shall be determined in accordance with this opinion.